**Diana VUKIC, Plaintiff,**

v.

**MELVILLE CORPORATION a/k/a CVS New York, Inc. and Metropolitan Life Insurance Company, Defendants**

**No. CIV. A. 98–0177L.**

United States District Court,
D. Rhode Island.

March 25, 1999.

Donna M. Nesselbush, Green, Greenberg & Nesselbush, Providence, RI, for Plaintiff.

Brooks R. Magratten, Vetter & White, Providence, RI, for Defendants.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

Diana Vukic ("Vukic") worked as a manager on the floor of a Marshall's store until she left work under the effects of mental distress. Whether or not she was disabled from working is the crux of plaintiff's dispute with her employer, Melville Corporation, and the insurer of her employer's disability plan, Metropolitan Life Insurance Company ("MetLife"). Vukic alleges that she suffered from a disabling depression. MetLife contends that she did not meet her burden of proving her disability. MetLife denied disability benefits to Vukic, and she now appeals to this Court under the Employee Retirement Income Security Act ("ERISA") to secure the payment of

benefits. *See* 29 U.S.C. § 1132(e)(1) and 1132(f).

The matter is presently before the Court on cross-motions for summary judgment. This Court is not required to decide whether or not Vukic was disabled. Instead, it only has to determine whether MetLife acted arbitrarily or capriciously in denying benefits. This Court has reviewed all the records in MetLife's file and concludes that a reasonable person could have rejected Vukic's claim based on the language of the ERISA Plan and the evidence in that file.

Therefore, plaintiffs' motion for summary judgment is denied, and defendant's motion for summary judgment is granted.

## I. *Facts*

Vukic, who lives in North Providence, Rhode Island, was a full-time manager at a Marshall's department store until May 22, 1994.[1] She was an "area floor manager." She supervised, trained and directed other employees in an area of the store. Through her job, Vukic was enrolled in a disability insurance plan administered by MetLife (the "Plan"). The Plan is an employee welfare benefit plan under ERISA, and Vukic was a participant.

Under the Plan, the participant must prove that she was disabled in order to receive benefits. (*See* Exhibit B to Hartz Affidavit at G5.) The Plan employs a two-stage definition of disability. During the first two years, a participant must demonstrate that she cannot "perform all the normal duties of [her] regular occupation for any employer" and that she has not engaged "in any occupation or employment for pay or profit." Beyond two years, the participant must show that she is "completely unable to engage in any occupation or employment for which [she is or becomes] qualified." (*See* id. at G7.) The Plan also requires that the participant prove that she is under a physician's care. (*See* id. at G2.)

Disability insurance for mental or nervous disorders is only available for two years unless the participant was institutionalized. (*See* id. at G4.) The participant must prove that she was disabled during a 180–day Qualifying Disability Period before she can receive benefits for a maximum of two years thereafter. (*See* id. at G2, G7.)

Vukic left her job because she was depressed. She sought treatment from Providence psychologist Dr. Robert Wuraftic in 1994, and over the next two years, she received psychotherapy from Dr. Wuraftic and his employee Robert Cherella, a graduate student. The two men diagnosed Vukic with recurrent depression.

On June 19, 1995, MetLife's predecessor company received a claim from Vukic for long-term disability.[2] Vukic claimed to be disabled because she was "unable to cope with making decisions and general stress—unable to concentrate." (*See* Exhibit E to Hartz Affidavit at 3.) Over the next two years, MetLife considered Vukic's claim, primarily through written reports by Dr. Wuraftic and Cherella. MetLife first rejected the claim on October 12, 1995. When Vukic appealed, following the Plan procedures, the company forwarded Vukic's medical records to a MetLife employee, Dr. Donald Grayson, a psychiatrist. Dr. Grayson was critical of the care Vukic had received, and MetLife rejected the claim again on June 21, 1996.

Eventually, Vukic retained counsel. On January 19, 1997, the Social Security Administration ruled that Vukic was disabled and entitled to disability benefits. A psychiatrist, Dr. Srephen DiZio, met Vukic on

---

1. Parties do not agree on Vukic's last day of work. Vukic uses May 22, 1994. (*See* Complaint at ¶ 8.) MetLife uses May 23, 1994. (*See* Affidavit of Hartz at ¶ 8.) This Court will use May 22 because it is included in the complaint.

2. MetLife is the successor to the Travelers Indemnity Company of Rhode Island, which originally wrote the long-term disability policy and received the first notice of claim.

December 3, 1996 and wrote a report for Social Security review. That was submitted to MetLife, but again the company rejected Vukic's claim on September 16, 1997, and Vukic brought this suit.

## II. *Legal Standard for Motion for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Therefore, the critical inquiry is whether a genuine issue of material fact exists. "Material facts" are those that might "affect the outcome of the suit under the governing law." *Hinchey v. NYNEX Corp.*, 144 F.3d 134, 140 (1st Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986)). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could resolve it in favor of either party. *See Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir.1997).

On a motion for summary judgment, the Court must view all evidence and related inferences in the light most favorable to the nonmoving party. *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 106 (1st Cir.1997). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir.1995). Similarly, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial." *Gannon v. Narragansett Elec. Co.*, 777 F.Supp. 167, 169 (D.R.I.1991).

The coincidence that both parties move simultaneously for summary judgment does not relax the standards under Rule 56. *See Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996). Barring special circumstances, the District Court must consider each motion separately, drawing inferences against each movant in turn. *See id.*

## III. *Review of an ERISA Administrator*

■ The Plan clearly gave MetLife the final discretion to decide a participant's eligibility for disability payments. As such, this Court reviews MetLife's decision using the arbitrary and capricious standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Grady v. Paul Revere Life Ins. Co.*, 10 F.Supp.2d 100, 110 (D.R.I.1998). This Court does not undertake de novo review to decide whether Vukic was disabled. Instead, it examines MetLife's decision and the material it had to consider, to gauge whether the decision was arbitrary or capricious.

## IV. *MetLife's Decision on Vukic*

To prove her disability, Vukic needed to prove to MetLife that her depression rendered her unable to "perform all the normal duties" of an area floor manager and that she did not work for pay during the period in question. She needed to prove that disability both for the 180–day Qualifying Disability Period and for the subsequent two years for which she sought benefits.

MetLife based its decision to reject Vukic's claim on two grounds. First, it asserts that Vukic was not being treated by a physician. Dr. Wuraftic was a psychologist and Cherella was a graduate student, so neither was a physician, namely a licensed graduate of medical school. Second, it argues that there was insufficient evidence in Vukic's application to support a finding of disability. Dr. Wuraftic and

Cherella wrote reports that stated that Vukic was mentally depressed and needed psychological help, but they never wrote that she was disabled from performing her work.

If either argument is supported, then MetLife had ample grounds to reject Vukic's claim. Therefore, this Court will examine those assertions in turn.

### A. *Lack of treatment by a physician*

The Plan requires the employee to be under the care of a physician. MetLife posits two reasons for asserting that Vukic was not under the care of a physician. First, it concluded factually that Vukic was under the care of Cherella, a graduate student who clearly does not qualify as a physician. Second, it concluded generally that a psychologist is not a physician, so even if Vukic was under the care of Dr. Wuraftic with assistance from Cherella, she was not treated by a physician.

### 1. *Who cared for Vukic?*

■ On the first issue, MetLife acted arbitrarily when it found that Vukic had been under the care of Cherella, not Dr. Wuraftic. Letters sent to MetLife were signed by both men. MetLife argues that initials at the bottom of some letters suggested that Cherella drafted the letters. However, the fact that Cherella drafted the letters does not establish that he was solely responsible for Vukic's care. Patients often see various professionals within a doctor's office. In a case discussing whether a psychologist could be the "attending physician" when his employees conducted the actual psychotherapy, the First Circuit found a genuine dispute of fact. *See Metropolitan Life Ins. Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984). If it was possible for the psychologist in *Ditmore* to be an "attending physician" even if he did not personally conduct psychotherapy, then it is certainly possible for Dr. Wuraftic to "care" for Vukic even if he acted in concert with his employee Cherel-

la. MetLife was wrong to assume otherwise without further investigation.

### 2. *Is a psychologist a physician?*

■ However, it is not clear whether MetLife acted arbitrarily when it decided that a psychologist is not a physician.

■ This Court holds that, generally, an ERISA administrator has the discretion to decide that a psychologist does not qualify as a physician, and it can reject all claims by plan participants who choose to be treated by a psychologist rather than a psychiatrist. An administrator may so interpret the Plan by relying on Rhode Island statutes that define "physician," *see* R.I. Gen. Law § 5–37–1(12) (defining physician as "person with a license to practice allopathic or osteopathic medicine in this state"), and that allow PhD-trained psychologists to treat patients without "practicing medicine" as long as they do not attach the title "physician" to their names, *see* R.I. Gen. Law § 5–37–1(13). Although the First Circuit has not ruled on this issue, a similar restriction has been noted by the Sixth Circuit. *See Taylor v. General Motors Corp.,* 826 F.2d 452, 455 (6th Cir.1987).

This Court recognizes that psychologists do treat patients for mental disorders, and their healing appears to qualify them under some definitions of "physician." *See, e.g., Webster's Ninth New Collegiate Dictionary* 887 (1986) ("a person skilled in the art of healing; *specif.* a doctor of medicine"). In fact, several circuits have ruled that administrative law judges must respect the opinion of a psychologist equally with that of a psychiatrist in determining disability for social security purposes. *See Crum v. Sullivan,* 921 F.2d 642, 644–45 (6th Cir.1990); *McAllister v. Sullivan,* 888 F.2d 599, 602 n. 3 (9th Cir.1989). However, an ERISA case is different. The issue here is whether MetLife was arbitrary when it interpreted the word "physician" in the Plan it administers, to exclude psychologists. Based on statutory definitions and general usage, this Court finds that

this is not, generally, an arbitrary determination.

The issue still remains in this case whether MetLife acted arbitrarily when it applied the "psychologist is not a physician" rule in Vukic's case. Specifically, Vukic's counsel argued in oral argument that MetLife has not shown that it has a sweeping policy to reject all treatment by non-MDs. Counsel insinuates that Met-Life created the policy to defeat Vukic's claims, and there is evidence to support that allegation. Dr. Wuraftic and Cherella wrote letters to MetLife over several years, and they even offered to have Vukic see a psychiatrist. MetLife never stated that it would disregard the care they gave because they were not physicians. In fact, MetLife and its employees critiqued Dr. Wuraftic and Cherella's treatment of Vukic, and MetLife in the end based the rejection of benefits on the lack of evidence that Vukic was disabled. That lack of evidence would have been irrelevant if MetLife truly had a policy of ignoring all care given by psychologists. At this time, this Court does not know what MetLife's policies were on this subject since neither party offered any evidence to prove the point one way or the other.

Thus, there is a genuine dispute on a material fact. Under *Blackie,* the Court must consider each motion separately, drawing inferences against each movant in turn. *See Blackie,* 75 F.3d at 721. On MetLife's motion for summary judgment, this Court must assume that MetLife does not have a policy to disregard treatment given by psychologists and, therefore, acted arbitrarily when it created one to reject Vukic's claim. On Vukic's motion for summary judgment, this Court makes the opposite assumption and thus must conclude that MetLife was not arbitrary. Consequently, Vukic's motion for summary judgment would fail, and MetLife's motion for summary judgment would also fail insofar as it is based on the argument that a psychologist is not a physician under the Plan.

## B. *The lack of evidence*

■ Even if Dr. Wuraftic qualifies as a physician, MetLife has a second and sound ground for rejecting Vukic's claim, i.e., that Vukic did not provide sufficient evidence of disability. Vukic bears the burden of proving her disability under the Plan. (*See* Exhibit B to Hartz Affidavit at G5.) Thus, she had to prove that she was unable to work during a 180–day Qualifying Disability Period. (*See id.* at G2). MetLife did not and does not bear the burden to disprove that claim. MetLife did not have a duty to have Vukic submit to an independent medical examination, and it did not have to defer to the Social Security determination that Vukic was disabled.

To decide whether Vukic was disabled, MetLife had to gauge whether she had been unable to perform as an area floor manager for Marshall's during the two relevant periods. The company concluded that Vukic had not shown that, and this Court must now determine whether that decision was arbitrary or capricious.

This Court has reviewed the evidence that Vukic provided to MetLife. (*See, e.g.,* Affidavit of Hartz and attached Exhibits (*hereinafter* Exhibits attached to this affidavit will be referred to by their letter).) That consists primarily of letters and reports from Dr. Wuraftic and graduate student Cherella. (*See* Exhibits E, F, H, J, N, and S.) MetLife also received an analysis of the treatment and care provided by them from Dr. Grayson, (*see* Exhibit O), and a December 6, 1996 report from Dr. Microulis, (*see* Exhibit T). Also in the file are additional reports that Dr. Wuraftic wrote to managers at Marshall's that were apparently not sent to MetLife. (*See* Exhibit W.)

In its pleading, MetLife argues that the reports by Dr. Wuraftic and Cherella led MetLife to certain conclusions, including that:

- No psychological testing had been performed on plaintiff since May 24, 1994.
- Plaintiff was not prescribed any medications for the treatment of her alleged depression during the Qualifying Disability Period.
- Neither Dr. Wuraftic nor Mr. Cherella referred plaintiff to a physician's care.
- Neither Mr. Cherella nor Dr. Wuraftic evaluated the specific requirements of plaintiff's work and explained why plaintiff's depression would prevent her from performing those duties.
- The Disability Claim Attending Physician Statement, suggesting a diagnosis of "major Depression / Recurrent—Moderate," was signed by Mr. Cherella, a graduate student (not a physician), and he lacked the qualifications to make that diagnosis.

(*See* Mem. in Supp. of D.'s Obj. to P.'s Opposing Mot. For Summ. J. at 7.)[3] These were all legitimate conclusions to draw, and in toto they provide support for MetLife's finding that Vukic had not proven she was disabled under the Plan. Additionally, MetLife relied on Dr. Grayson's report that criticizes Cherella's care of Vukic as "subpar" and suggests that Cherella's opinions on Vukic's disability were unreliable.

This Court makes additional findings that support MetLife's conclusion. In the October 25, 1995 letter, Dr. Wuraftic and Cherella made their most-specific statement:

Mrs. Vukic would be unable to engage in and perform the duties required of her a manager [sic] for the Melville Corporation due to her current level of emotional dysfunction.

(*See* Exhibit J at 1.) However, this letter does not provide any evidence that Dr. Wuraftic and Cherella knew the description of Vukic's job, and they did not explain to MetLife how Vukic's dysfunction

affected her job responsibilities. Nor did they specifically addresses the Qualifying Disability Period. As late as April 1996, the pair employed indecisive descriptions:

[H]er ability at this time to return to a managerial position consistent with what she had established at Marshall's in the past appears questionable, given her current emotionality.

(Exhibit N at 1.) In the other letters, the pair used phrases such as returning to work would be "anti-therapeutic," (*see* Exhibit F at 1), or "counter-productive," (*see* id. at 4). That is not evidence that they found Vukic to be disabled. There is a vast difference between saying that a return to work would slow a patient's recovery and saying that the patient is medically unable to do her job.

MetLife interpreted Dr. Wuraftic and Cherella's letters as insufficient evidence to prove that Vukic was disabled. In the final denial, MetLife employee Anne Stanton wrote:

In summary, Ms. Vukic clearly has had a number of very significant, stressful life situations. Personal and family life pressures can certainly cause one to feel overwhelmed. However, the documentation is insufficient to support the total disability[.]

(*See* Exhibit V at 2.) That was a reasonable decision based on all the written evidence, specifically the lack of a clear diagnosis or any detailed findings by Dr. Wuraftic and Cherella. MetLife declined to reconsider based on the December 6, 1996 report by Dr. DiZio, (*see* Exhibit T), or the January 19, 1997 Social Security Administration finding that Vukic was disabled, (*see* Exhibit R). That was a reasonable decision because the Plan referred to two periods—the 180–day Qualifying Disability Period and the two-year benefits period after Vukic left her job in May 1994. Dr. DiZio did not meet with Vukic until December 1996, so he could

---

**3.** This Court omits MetLife's conclusion that Dr. Wuraftic and Cherella were not physicians because MetLife's reliance on that fact may have been arbitrary. (*See* Section IV(A), *supra.*)

not describe her condition during those previous significant periods.

Examining the evidence in total, it is clear that MetLife had legitimate reasons for rejecting Vukic's claim for disability benefits. Vukic bore the burden of proving that her depression made her unable to work in her job during the two relevant periods. MetLife acted within its discretion in concluding that there was insufficient evidence of such disability. Dr. Wuraftic and Cherella made that claim weakly and without any specifics, and MetLife was reasonable both in discounting their views and in refusing to regard Dr. Microulis's report as probative of the Qualifying Disability Period.

Therefore, MetLife was not arbitrary or capricious in finding that Vukic failed in her burden under the Plan to prove that her illness caused her disability as therein defined.

### CONCLUSION

This Court emphasizes that it does not decide whether or not Vukic had a serious depression. Vukic had an ample opportunity to prove to MetLife that her depression caused her to be disabled from work during the relevant time periods. She did not sustain that burden of proof. Therefore, MetLife did not act arbitrarily or capriciously when it rejected her claim.

For the preceding reasons, plaintiff's motion for summary judgment is denied, and defendants' motion for summary judgment is granted. Judgment shall enter for defendants, Melville Corporation and Metropolitan Life Insurance Company.

It is so Ordered.